**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MELISSA LEE ROTHERMEL,** | : | **CIVIL ACTION NO. 1:16-CV-1669** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **DAUPHIN COUNTY,** | : | |
| **PENNSYLVANIA,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

This Section 1983 case arises out of the mistaken arrest of plaintiff Melissa Lee Rothermel ("Melissa Lee") on a bench warrant intended for another person, Melissa Ann Rothermel ("Melissa Ann"). Melissa Lee asserts various constitutional claims against several individuals and entities involved in her arrest and three-day detention. All remaining defendants moved for summary judgment, and Magistrate Judge Martin C. Carlson issued a report recommending that we grant the motions. Melissa Lee objects to each of the report's dispositive recommendations.

## I. <u>Legal Standards</u>

### A. Review of Magistrate Judge's Report & Recommendation

When a party objects to a magistrate judge's report and recommendation, the district court undertakes *de novo* review of the contested portions of the report. See <u>E.E.O.C. v. City of Long Branch</u>, 866 F.3d 93, 99 (3d Cir. 2017) (quoting 28 U.S.C. § 636(b)(1)); <u>see</u> <u>also</u> FED. R. CIV. P. 72(b)(3). In this regard, Local Rule of Court 72.3 requires written objections to "specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for

such objections." LOCAL RULE OF COURT 72.3. We afford "reasoned consideration" to uncontested portions of the report before adopting it as the decision of the court. City of Long Branch, 866 F.3d at 100 (quoting Henderson v. Carlson, 812 F.2d 874, 878 (3d Cir. 1987)).

### B. Summary Judgment

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forward with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

## II.   **Background**[1]

The pertinent facts underlying this case are these.  On February 16, 2015—

the President's Day holiday that year—Melissa Lee and her minor daughter, C.R.,

were driving home on Interstate 81 from a shopping trip.  (Doc. 138 at 7).  Not long

after Melissa Lee merged onto the highway, she passed Pennsylvania State Police

("PSP") Trooper David Grbich, who noted what he thought may be an expired

registration sticker on Melissa Lee's license plate.  (Id.)  Trooper Grbich ran Melissa

Lee's license plate number to check the validity of her registration with the

Pennsylvania Department of Transportation ("PennDOT").  (Id.)  This search

confirmed that Melissa Lee's registration was current, but also returned a hit from

---

[1] We dispense with a detailed recitation of the relevant facts and adopt as our own the statement of facts set forth in Judge Carlson's report, supplementing with additional record citation as appropriate.  (See Doc. 138 at 4-14).  We reiterate only that background necessary for context above.  While Melissa Lee objects to certain aspects of Judge Carlson's statement of facts, (see Doc. 141 ¶¶ 1-8), her objections either ignore critical context or are ultimately immaterial.  For example, Melissa Lee objects to Judge Carlson's statement that officers were presented with "a facially valid bench warrant in which all pertinent identifiers matched Melissa Lee Rothermel's information, save the spelling of the first and middle names," suggesting that Judge Carlson ignored that there was also a discrepancy between Melissa Lee's apparent weight and Melissa Ann's weight as stated in the NCIC hit.  (Id. ¶ 2).  But Judge Carlson did explore this argument, noting just two sentences later that the officer who initiated the traffic stop testified that he did not notice a weight discrepancy at the time but would not have been concerned about it given the amount of time that had passed since the warrant issued. (Doc. 138 at 31-32).  Melissa Lee also objects to Judge Carlson's reliance on facts set forth in the Rule 56.1 statement of a dismissed defendant, claiming that reliance on this statement was error since Melissa Lee did not file a corresponding Rule 56.1 response.  (See Doc. 141 at 2 ¶ 1 & n.1).  These facts were supplied for contextual background and have no impact on our resolution of the remaining defendants' motions; thus, any perceived error is harmless.  Melissa Lee's remaining objections to the factual background in the report are either irrelevant disputes over semantics or immaterial to the dispositive questions in this case.

the National Crime Information Center ("NCIC") for an outstanding bench warrant for "Rothermel, Mellisa Ann," with an "AKA" of "Rothermel, Melissa Ann." (Doc. 92 ¶¶ 8-9; Doc. 116 ¶¶ 8-9). Trooper Grbich checked the NCIC hit for Melissa Ann against PennDOT records for Melissa Lee. (Doc. 138 at 8). He noted that the middle names did not match, but that all other then-available identifiers—first and last names, date of birth, Social Security number, and driver's license number—were identical.[2] (Id.; see also Doc. 92-1, Grbich Dep. 10:16-19).

Trooper Grbich initiated a traffic stop of Melissa Lee's vehicle. Melissa Lee provided her driver's license and registration card to Trooper Grbich and verified her Social Security number. (Doc. 138 at 8; Doc. 92-2, Rothermel Dep. 23:10-13). The bulk of Melissa Lee's verified identifying information, including her date of birth, Social Security number, and driver's license number, corresponded exactly to the identifying information on the NCIC hit for Melissa Ann. (Doc. 138 at 8). The record reflects that the sex, height, and eye color listed on the NCIC hit matched the information in Melissa Lee's PennDOT record as well. (See Doc. 92 ¶¶ 8-9; Doc. 116 ¶¶ 8-9). Melissa Lee has supplied evidence suggesting a weight discrepancy—

---

[2] Melissa Lee rejoins that the first names did not match, noting that the primary name entry on the NCIC hit spelled Melissa with two "l"s and one "s." (Doc. 116 ¶ 14; see Doc. 117 at 18). She does not dispute that the NCIC hit that appeared for Trooper Grbich clearly listed "Melissa Ann Rothermel" as an alternative spelling of the wanted individual's name. (Doc. 116 ¶ 9). Melissa Lee also emphasizes that the proper spelling of Melissa Ann's last name is "Rotharmel," not "Rothermel." (Doc. 129 ¶ 3; Doc. 141 ¶ 6). Although there is some inconsistency in spelling throughout the underlying state court dockets, there is no dispute that both the NCIC hit and the bench warrant spelled the wanted individual's last name as "Rothermel." (See Docs. 108-16, 108-25).

medical records indicate that she weighed 250 pounds at the time of the stop, (Doc. 112-4 at 2), while the NCIC hit listed a weight of 150 pounds for Melissa Ann, (Doc. 108-25)—but Trooper Grbich testified that he did not notice the discrepancy and that, in any event, weight was not a "deciding factor" for him given that it could have fluctuated in the four years since the bench warrant issued.[3] (Grbich Dep. 43:6-13). Trooper Grbich then called the dispatcher, noted the middle-name discrepancy, and was told that the sheriff's department wanted Melissa Ann detained. (Doc. 138 at 8-9).

Trooper Grbich informed a surprised Melissa Lee that she was being arrested on an outstanding bench warrant. (Id.) Melissa Lee insisted that Trooper Grbich was mistaken or that her identity had been stolen, to no avail. (Id.) When PSP Trooper Matthew Miller arrived on scene to transport Melissa Lee to Dauphin County Prison, Melissa Lee redirected her entreaties to him. (Id.) Trooper Miller double-checked Melissa Lee's name and Social Security number against the NCIC hit and confirmed the match. (Id.) Arrangements were made for Trooper Grbich to take Melissa Lee's daughter to the home of a family friend while Trooper Miller took Melissa Lee into custody. (Id. at 9-10). Trooper Miller then drove Melissa Lee

---

[3] Melissa Lee claims that Trooper Grbich *did* notice the weight difference, citing a portion of Trooper Grbich's deposition testimony where he explained that "due to weight changes, four years, weight wasn't a deciding factor for me." (Doc. 116 ¶ 15 (citing Grbich Dep. 43:11-12)). Melissa Lee's claim that this suggests an awareness of the discrepancy is flatly contradicted by the preceding lines, omitted from her citation, where Trooper Grbich was asked directly whether he "ma[d]e any note of the discrepancy at all" and responded unequivocally, "I did not." (Grbich Dep. 43:6-10).

to Dauphin County Prison, where she was processed into custody and detained until her release three days later. (Id.)

Melissa Lee's mistaken arrest had its genesis in an error that occurred nearly six years earlier. On June 23, 2009, PSP Trooper (now Corporal) Randy Orlic filed a state-court criminal complaint charging "Mellisa Ann Rothermel" with theft of services. (Id. at 4; see Doc. 108-1). The complaint named the correct defendant (albeit with a misspelled first name) but somehow incorporated Melissa Lee's date of birth, Social Security number, and driver's license information. (Doc. 138 at 4). To date, the parties cannot explain how this error occurred. (See id. at 4-5). Throughout the ensuing state-court proceedings, Melissa Ann signed several documents bearing Melissa Lee's identifiers without correcting the errors. (See id. at 5-6). Thus, Melissa Lee's identifying information became part of Melissa Ann's criminal court record. (See id.) And when Melissa Ann violated her probation in January 2011 and failed to appear for revocation proceedings, the resulting court-ordered bench warrant issued by the Dauphin County Clerk of Court conflated Melissa Ann's and Melissa Lee's identities. (See id. at 6-7).

A constellation of circumstances delayed discovery of this latent error for three days after Melissa Lee's February 16, 2015 arrest. (See id. at 9-13). Because Melissa Lee was arrested on a bench warrant, she was taken straight to Dauphin County Prison rather than being fingerprinted and processed at the county booking center. (See id. at 9-10). The prison's records office—which is ordinarily the first "fail-safe" for verifying a detainee's identity—was closed for the

President's Day holiday. (Id. at 11-12). Melissa Lee instead met with other prison staff, principally Correctional Officer Warca Escalante, for processing. (Id. at 12). Melissa Lee told prison staff about the errors in the paperwork and reiterated that she had been misidentified but was forced to sign the documents anyway. (Id. at 12 & n.3). During discovery, Escalante revealed that she was unaware of the prison's "extraordinary occurrence" protocol, which should have been invoked immediately when Melissa Lee claimed she had been misidentified. (See id. at 12-13 & n.3). Because of the holiday, Melissa Lee's concerns did not reach a treatment specialist, ordinarily part of the intake team, until two days after her arrest. (See id. at 11-13). On February 18, after approximately 48 hours in custody, Melissa Lee met with a treatment specialist who began investigating her claims of misidentification. (Id. at 13). At 2:30 p.m. the following day, a Dauphin County judge ordered that Melissa Lee be released from custody. (Doc. 108 ¶¶ 70-71; Doc. 128 ¶¶ 70-71). It is unclear whether it was the efforts of the assigned treatment specialist or those of Melissa Lee's husband, who spoke to their state senator, that ultimately secured Melissa Lee's release. (Doc. 108 ¶ 70; Doc. 128 ¶ 70).

Melissa Lee commenced this case on August 11, 2016, alleging a multitude of constitutional violations arising from her mistaken arrest and detention. After two rounds of Rule 12 motion practice and voluntary dismissal of Trooper Orlic, the following claims remain: a Fourth Amendment false arrest claim against Trooper Grbich and Trooper Miller (Count I), a municipal liability claim against Dauphin County and its Clerk of Court (the "Dauphin County defendants") for a custom or

policy of deliberate indifference to constitutional rights (Count III), and failure-to-train claims against both the PSP Commissioner (Count IV) and Dauphin County (Count V).

### III.  **Discussion**

Judge Carlson recommends that the court grant summary judgment to all defendants on Melissa Lee's remaining claims.  As to the PSP defendants, the report concludes that Trooper Grbich and Trooper Miller did not transgress the Fourth Amendment when they arrested Melissa Lee and, as a result, are entitled to qualified immunity.  The report further concludes that, because the current PSP Commissioner was not in office when Melissa Lee was arrested, he cannot be held liable for policies that precipitated her arrest and that, in any event, existing PSP policies are constitutionally sound.  As to the Dauphin County defendants, the report opines that no underlying constitutional violation has been established, defeating any claim for municipal liability.

Melissa Lee filed robust objections challenging each of the report's conclusions and triggering omnibus *de novo* review by this court.  See City of Long Branch, 866 F.3d at 99 (quoting 28 U.S.C. § 636(b)(1)); FED. R. CIV. P. 72(b)(3).  After careful review of the record and the parties' comprehensive briefing, we agree with the result recommended by Judge Carlson—that summary judgment be granted to all defendants on all claims—but believe this result can be reached on somewhat different and narrower grounds.  We thus write separately to set forth

our independent analysis in support of the judgment to follow. Unless expressly incorporated, the report's legal analysis is superseded by this memorandum.

### A. The PSP Defendants—Trooper Grbich and Trooper Miller

We turn first to Melissa Lee's claim under 42 U.S.C. § 1983 that Trooper Grbich and Trooper Miller violated the Fourth Amendment to the United States Constitution by arresting her without probable cause. Section 1983 of Title 42 of the United States Code creates a private cause of action to redress constitutional wrongs committed by state officials. 42 U.S.C. § 1983. The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law. Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a Section 1983 claim, plaintiffs must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law." Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

There is no dispute that Trooper Grbich and Trooper Miller are state actors for purposes of Section 1983. The Troopers instead contend that their conduct did not deprive Melissa Lee of her Fourth Amendment rights because a facially valid bench warrant supplied probable cause to arrest, their conduct was objectively reasonable given that the identifiers listed on the NCIC hit matched virtually all of Melissa Lee's identifiers, and, in any event, they are entitled to qualified immunity. Melissa Lee vigorously opposes each argument. We will

consider the parties' respective positions through the prism of the Troopers'

qualified immunity defense.

Qualified immunity[4] protects a state actor who has committed a

constitutional violation if the plaintiff's rights were not "clearly established" when

the individual acted. <u>Pearson v. Callahan</u>, 555 U.S. 223, 244-45 (2009). No liability

will attach if a reasonable actor could have believed the challenged conduct was in

compliance with settled law. <u>Id.</u>; <u>see also</u> <u>Springer v. Henry</u>, 435 F.3d 268, 280 (3d

Cir. 2006). The doctrine cloaks government officials with "immunity from suit

rather than a mere defense to liability," <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985)

(emphasis omitted), and "ensure[s] that insubstantial claims against government

officials [will] be resolved prior to discovery." <u>Pearson</u>, 555 U.S. at 231-32 (quoting

<u>Anderson v. Creighton</u>, 483 U.S. 635, 640 n.2 (1987)). The defense generally shields

_____

[4] The report and recommendation intimates that absolute immunity, rather than qualified immunity, might apply to Trooper Grbich and Trooper Miller, presumably on the theory that executing a bench warrant is akin to executing a court order. (<u>See</u> Doc. 138 at 29-30 (quoting <u>Tarapchak v. Lackawanna County</u>, 173 F. Supp. 3d 57, 87 (M.D. Pa. 2016))). Absolute immunity is available for certain individuals who engage in quasi-judicial acts at the court's direction. <u>See</u> <u>Davis v. Borough</u>, 669 F. Supp. 2d 532, 535 (E.D. Pa. 2009) (discussing <u>Hamilton v. Leavy</u>, 322 F.3d 776, 782-83 (3d Cir. 2003) (prison officials); <u>Waits v. McGowan</u>, 516 F.2d 203, 206-07 (3d Cir. 1975) (family-court employees); <u>Lepre v. Tolerico</u>, 156 F. App'x 522, 525 (3d Cir. 2005) (investigator assisting prosecution)); <u>see also</u> <u>Tarapchak</u>, 173 F. Supp. 3d at 87 (director of county's house-arrest program). But we are aware of no precedent extending quasi-judicial absolute immunity to police officers. At least one district court has expressly rejected that argument, noting that police officers have never been granted "an absolute and unqualified immunity" at common law. <u>Davis</u>, 669 F. Supp. 2d at 535 (quoting <u>Pierson v. Ray</u>, 386 U.S. 547, 555 (1967)). Although our separate conclusions render this a moot point, we are inclined to agree with the <u>Davis</u> court that it is qualified immunity, not quasi-judicial absolute immunity, that is available to police officers such as Trooper Grbich and Trooper Miller.

"all but the plainly incompetent or those who knowingly violate the law." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 743 (2011) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).  The burden to establish qualified immunity rests with the defendant claiming its protection.  <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

A court evaluating a claim of qualified immunity considers two distinct inquiries: whether, based on the record evidence, a constitutional right has been violated and, if so, whether that right was "clearly established" at the time of the alleged violation.  <u>See</u> <u>Spady v. Bethlehem Area Sch. Dist.</u>, 800 F.3d 633, 637 (3d Cir. 2015) (quoting <u>Pearson</u>, 555 U.S. at 232).  A court may begin its qualified immunity analysis with either prong.  <u>Pearson</u>, 555 U.S. at 236.  Our analysis begins and ends with the first.

To prevail on her Fourth Amendment claim for false arrest, Melissa Lee must show that she was arrested without probable cause.  <u>See</u> <u>Andrews v. Scuilli</u>, 853 F.3d 690, 697 (3d Cir. 2017) (quoting <u>Blaylock v. City of Philadelphia</u>, 504 F.3d 405, 411 (3d. Cir. 2007); <u>Dowling v. City of Philadelphia</u>, 855 F.2d 136, 141 (3d Cir. 1988)).  As the Supreme Court of the United States recently reiterated, "[p]robable cause 'is not a high bar.'"  <u>District of Columbia v. Wesby</u>, 583 U.S. ___, 138 S. Ct. 577, 586 (2018) (quoting <u>Kaley v. United States</u>, 571 U.S. ___, 134 S. Ct. 1090, 1103 (2014)).  It exists when facts and circumstances known to an arresting officer "are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."  <u>Dempsey v. Bucknell Univ.</u>, 834

F.3d 457, 467 (3d Cir. 2016) (quoting <u>Orsatti v. N.J. State Police</u>, 71 F.3d 480, 483 (3d Cir. 1995)).  The relevant inquiry is not whether the person committed the crime for which they were arrested, but whether the officer had probable cause to believe so at the time of the arrest.  <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 634 (3d Cir. 1995) (quoting <u>Dowling</u>, 855 F.2d at 141); <u>see</u> <u>also</u> <u>Wright v. City of Philadelphia</u>, 409 F.3d 595, 602 (3d Cir. 2005) (quoting <u>Hill v. California</u>, 401 U.S. 797, 804 (1971)).  Summary judgment is appropriate if, viewing the evidence in a light most favorable to the plaintiff, a reasonable jury could not find that officers lacked probable cause.  <u>See</u> <u>Estate of Smith v. Marasco</u>, 318 F.3d 497, 514 (3d Cir. 2003) (quoting <u>Sherwood v. Mulvihill</u>, 113 F.3d 396, 401 (3d Cir. 1997)).

As we explained in our first Rule 12 opinion, an active and facially valid arrest warrant will generally supply probable cause to arrest.  <u>See</u> <u>Lawson v. Pa. SPCA</u>, 124 F. Supp. 3d 394, 405 (E.D. Pa. 2015) (citing <u>Kis v. County of Schuylkill</u>, 866 F. Supp. 1462, 1469 (E.D. Pa. 1994) (citing <u>Baker v. McCollan</u>, 443 U.S. 137, 144 (1979); <u>Graham v. Connor</u>, 490 U.S. 386, 389 (1989))).  But an erroneously issued warrant—that is, one that is facially valid but genuinely invalid—does not supply probable cause for arrest.  <u>See</u> <u>Berg v. County of Allegheny</u>, 219 F.3d 261, 271 (3d Cir. 2000); <u>Pitchford v. Borough of Munhall</u>, 631 F. Supp. 2d 636, 650-51 (W.D. Pa. 2007) (citing <u>Berg</u>, 219 F.3d at 269-71).

Melissa Lee contends that this case is exactly like <u>Berg v. County of Allegheny</u>, 219 F.3d 261 (3d Cir. 2000), in which the Third Circuit held that a facially valid but erroneously issued arrest warrant did not supply probable cause to arrest

the plaintiff. In <u>Berg</u>, a warrant clerk transposed two digits in a criminal complaint number when preparing to issue an arrest warrant for parole violator Paul Banks. <u>Berg</u>, 219 F.3d at 266-67. The error resulted in issuance of a warrant for an entirely different individual, the plaintiff, Raymond Berg, who had completed his parole term three years earlier. <u>Id.</u> Berg was arrested by a constable on the erroneously issued warrant and detained for nearly a week before his attorney intervened and secured his release. <u>Id.</u> at 268. In Berg's subsequent false-arrest suit against the warrant clerk, the arresting constable, and others, the district court found that the existence of a facially valid arrest warrant supplied probable cause to support Berg's arrest and defeat his Section 1983 claim. <u>Id.</u> at 269.

The Third Circuit reversed, invoking several Supreme Court and Third Circuit authorities to hold that "an erroneously issued warrant cannot provide probable cause for an arrest." <u>Id.</u> at 269-71. That is, "[b]ecause the government officials who issued the warrant . . . did not have probable cause to arrest Berg,"— the individual named in the warrant—the warrant itself was invalid and Berg's arrest violated the Fourth Amendment. <u>Id.</u> at 271. Each of the cases cited in <u>Berg</u> supported this conclusion. In <u>Whitely v. Warden, Wyoming State Penitentiary</u>, 401 U.S. 560 (1971), the Supreme Court held that an officer's reliance on a facially valid arrest warrant that was later found to lack probable cause violated the Fourth Amendment. In <u>United States v. Hensley</u>, 469 U.S. 221 (1985), the Court said that reasonable reliance on a flyer issued by another police department to conduct a <u>Terry</u> stop would not satisfy the Fourth Amendment unless the officers who issued

the flyer themselves had reasonable suspicion. And in <u>Rogers v. Powell</u>, 120 F.3d 446 (3d Cir. 1997), the Third Circuit rejected an officer's argument that he had not violated the Fourth Amendment when he arrested an individual based on a probation officer's erroneous report that an arrest warrant had issued. Each case turned on whether there was a valid basis for the Fourth Amendment seizure—not whether officers seized the wrong person on that valid basis.

We disagree with Melissa Lee that <u>Berg</u> applies to vitiate probable cause here.[5] (<u>See</u> Doc. 142 at 20-21). Unlike <u>Berg</u> and the cases that it cites, there can be no genuine dispute as to the validity of the bench warrant issued for Melissa Ann. Melissa Lee concedes that the warrant is facially valid. (<u>Id.</u> at 20). And she does not argue that the warrant for Melissa Ann lacked probable cause. (<u>See generally</u> Docs. 112, 117, 119, 129, 142). Although Melissa Lee claims the county court later declared the bench warrant and associated NCIC hit to be "invalid," (Doc. 112 at 23; Doc. 117 at 15), that is not an accurate representation of the court's order, which stated only that the person in custody was not the person sought by the bench

---

[5] Judge Carlson's report distinguishes <u>Berg</u>, opining that the element of "direct culpability that was central to the holding in <u>Berg</u> is missing here." (Doc. 138 at 32-34 n.7). We do not read <u>Berg</u> to establish a direct-culpability requirement, at least not as to the threshold probable cause inquiry. The court emphasized that it mattered not who made the initial error in determining whether the warrant was valid, <u>see Berg</u>, 219 F.3d at 271, and it allowed the case to proceed against the constable who executed the warrant even after granting summary judgment to the clerk who made the error, <u>see id.</u> at 273-74. The report also opines that <u>Berg</u> may no longer be good law, suggesting that later Supreme Court decisions limited the earlier case law on which <u>Berg</u> is based. (<u>See</u> Doc. 138 at 32 n.7). Because we hold that <u>Berg</u> does not apply in the manner that Melissa Lee claims, we do not address this *obiter dictum.*

warrant and "reissued" the warrant for Melissa Ann "with the corrected information," (Doc. 112-8). In sum, this is simply not the situation contemplated by <u>Berg</u>, where an arrest is made based on a facially valid warrant that is later found to lack probable cause.

Melissa Lee also argues that, valid warrant or not, Trooper Grbich's and Trooper Miller's conduct was objectively unreasonable. This argument goes both to the merits of her Fourth Amendment claim and to the Troopers' qualified immunity defense. <u>See</u> <u>Blassengale v. City of Philadelphia</u>, No. 11-3006, 2012 WL 4510875, at *4 n.12 (E.D. Pa. Sept. 28, 2012) (noting that whether Fourth Amendment violation occurred and whether arresting officers are entitled to qualified immunity are "co-extensive" inquiries) (citation omitted). An officer executing an arrest warrant is not required to "investigate independently *every* claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent." <u>Baker</u>, 443 U.S. at 145-46 (emphasis added). Nonetheless, some courts in this circuit have held that a Fourth Amendment claim may lie, even in the face of a valid warrant, if the wrong person is arrested and the arresting officer's reliance on the warrant is objectively unreasonable under the totality of the circumstances. <u>See</u> <u>Alassani v. Walter</u>, No. 10-4491, 2011 WL 135018, at *5 (E.D. Pa. Jan. 14, 2011); <u>Davis v. McKenna</u>, No. 04-1012, 2006 WL 1453119, at *3 (W.D. Pa. May 18, 2006); <u>McHenry v. County of Delaware</u>, No. 04-1011, 2005 WL 2789182, at *5 (E.D. Pa. Oct. 24, 2005); <u>Doherty v. Haverkamp</u>, No. 93-5256, 1997 WL 297072, at *6, 8-11 (E.D. Pa. May 28, 1997).

These cases have their roots in the United States Supreme Court's holdings in <u>Graham v. Connor</u>, 490 U.S. 386 (1989), and <u>Hill v. California</u>, 401 U.S. 797 (1971), which establish that there is no automatic Fourth Amendment violation when the wrong person is arrested on a valid warrant and that the question is whether the officer "reasonably" mistook the person arrested for the person sought.  <u>See</u> <u>Graham</u>, 490 U.S. at 396 (citing <u>Hill</u>, 401 U.S. 797); <u>Hill</u>, 401 U.S. at 802; <u>see</u> <u>also</u> <u>McHenry</u>, 2005 WL 2789182, at *5 (quoting <u>Doherty</u>, 1997 WL 297072, at *6 (citing <u>Graham</u>, 490 U.S. 368; <u>Hill</u>, 401 U.S. 797)).  And they are consistent with the settled axiom that the "touchstone" of every Fourth Amendment inquiry is reasonableness.  <u>Wright</u>, 409 F.3d at 602 (quoting <u>Hill</u>, 401 U.S. at 804).  Reasonableness is likewise the linchpin of qualified immunity; as the Third Circuit noted in <u>Berg</u>, courts will generally grant immunity to officers who have made a mistaken arrest "based on an objectively reasonable belief that there is a valid warrant."  <u>Berg</u>, 219 F.3d at 272-73 (collecting cases).

We must therefore ask whether Melissa Lee has adduced evidence from which a jury could find that either Trooper Grbich or Trooper Miller acted objectively unreasonably in arresting her.  The largely undisputed record, viewed in a light most favorable to Melissa Lee, establishes the following.  When Trooper Grbich ran Melissa Lee's license plate number to check her registration, he encountered an NCIC hit for "Mellisa Ann Rothermel," also known as "Melissa Ann Rothermel."  He noted that, but for the middle name, all available identifiers on the NCIC hit—first and last names, date of birth, Social Security number, and driver's

license number—matched Melissa Lee's PennDOT records. After double-checking the match, he initiated a traffic stop and confirmed that the information on Melissa Lee's physical driver's license as well as her Social Security number matched the NCIC hit. Trooper Grbich flagged the middle-name discrepancy to his dispatcher, who reported that the sheriff's office wanted the suspect arrested. Trooper Grbich did not notice that Melissa Lee weighed approximately 100 pounds more than the weight listed in the NCIC hit. Although Melissa Lee expressed genuine surprise and repeatedly claimed innocence, Trooper Grbich did not ask his dispatcher for a photograph of the suspect[6] or request a copy of the warrant itself, which would have revealed discrepancies between Melissa Ann's and Melissa Lee's addresses and phone numbers. When Trooper Miller arrived on scene, Melissa Lee again expressed confusion, prompting Trooper Miller to double-check that both her name and Social Security number matched the NCIC hit before transporting her to Dauphin County Prison.

On these undisputed facts, no rational juror could find that Trooper Grbich or Trooper Miller acted unreasonably. Trooper Grbich confirmed, several

---

[6] Melissa Lee maintains that Trooper Grbich had the resources "to request a photograph of the suspect" and chose not to do so. (Doc. 117 at 19 (citing Grbich Dep. 16:6-16)). The cited portion of Trooper Grbich's deposition testimony does not suggest that he had the ability to obtain a mugshot or other photograph associated with the warrant for comparison; he confirmed only that, if identity issues arose during a traffic stop, he had the ability to request a photograph from PennDOT. (See Grbich Dep. 16:6-16; see also id. at 52:2-11). Presumably, if Trooper Grbich supplied Melissa Lee's driver's license number, PennDOT would have returned a photograph of Melissa Lee—substantiating instead of undermining the identification. (See id. at 52:2-11).

times, that nearly all of Melissa Lee's identifiers matched those listed on the NCIC hit. He did not ignore the middle-name discrepancy; instead, he reported it to his dispatcher and was nonetheless told to detain the individual thought to be Melissa Ann. The apparent match was reviewed again by Trooper Miller when Melissa Lee expressed her concerns directly to him. Only after the match was verified multiple times by two different Troopers was Melissa Lee taken into custody. We are aware of no precedent that would have required the Troopers to do more—indeed, the Supreme Court has held the contrary to be true. See Baker, 443 U.S. at 145-46.

At the time of Melissa Lee's arrest, Trooper Grbich and Trooper Miller had probable cause to arrest based on a facially valid bench warrant and reasonably concluded—as any objectively reasonable officer could have based on a near-perfect match of identifiers—that Melissa Lee was the individual sought by that warrant. That latent errors in court records underlying the warrant caused the wrong person to be arrested does not invalidate the legitimate basis for the arrest. Hence, Melissa Lee has not established a Fourth Amendment violation as to either Trooper Grbich or Trooper Miller, and both defendants are entitled to qualified immunity.[7]

---

[7] Trooper Miller also raises a statute of limitations defense. (See Doc. 103 at 6-10). Judge Carlson's report does not take up that defense, and Trooper Miller did not file an objection reasserting it. Because we conclude that Melissa Lee's claim against Trooper Miller fails on its merits and by application of qualified immunity, we do not address the limitations issue.

## B.    The PSP Defendants—PSP Commissioner[8]

Melissa Lee also raises a Section 1983 claim for declaratory and prospective injunctive relief against the PSP Commissioner under *Ex parte* Young, 209 U.S. 123 (1908).  She avers, and some evidence of record suggests, that the PSP has stripped its troopers of discretion to determine whether to arrest an individual when faced with a confirmed NCIC hit.  (Doc. 48 ¶ 151; Doc. 119 at 15).  Melissa Lee claims that this alleged policy or custom applies even in situations in which "serious questions on a person's identity are raised."  (Doc. 119 at 15).

An allegedly unconstitutional state policy or custom may be challenged in federal court in an official-capacity action for prospective relief.  See Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985) (citing *Ex parte* Young, 209 U.S. 123); see also Koslow v. Commonwealth of Pennsylvania, 302 F.3d 161, 178 (3d Cir. 2002) (quoting Graham, 473 U.S. at 167 n.14).  To prevail, the plaintiff must establish an ongoing violation of federal law and that the governmental policy or custom was the "moving force" behind that violation.  Graham, 473 U.S. at 166 (quoting Polk County v. Dodson, 454 U.S. 312, 326 (1981)).  That is, Melissa Lee must show that a "policy or custom" of the PSP "played a part" in the claimed constitutional

---

[8] Colonel Tyree Blocker ("Commissioner Blocker") was Commissioner of the PSP when Melissa Lee initiated this action in August 2016.  Colonel Robert Evanchick ("Commissioner Evanchick") was named Acting Commissioner of the PSP effective March 24, 2018, and was confirmed on June 4, 2019.  Commissioner Evanchick is automatically substituted as the defendant in this action.  See FED. R. CIV. P. 25(d).  Although neither party's summary judgment briefing acknowledges this automatic substitution, we construe any arguments made on Commissioner Blocker's behalf as being made on behalf of Commissioner Evanchick.

violation.  <u>Graham</u>, 473 U.S. at 166 (citing <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808 (1985); <u>Monell v. Dep't of Social Servs.</u>, 436 U.S. 658 (1978)).

At the outset, we reject the argument that, because Melissa Lee did not sue the Commissioner in office at the time of her arrest, her official-capacity suit must fail.  (<u>See</u> Doc. 99 at 9-10).  That would be true if Melissa Lee had lodged an individual-capacity claim attempting to attribute personal liability to the former Commissioner.  But she did not.  Melissa Lee instead has sued the Commissioner in his official capacity for prospective injunctive and declaratory relief under *Ex parte Young*.  Her claim is that the "entity itself"—here, the PSP—caused a deprivation of her Fourth Amendment rights.  <u>See</u> <u>Graham</u>, 473 U.S. at 166; <u>see</u> <u>also</u> <u>id.</u> ("[An *Ex parte Young* official-capacity suit] is *not* a suit against the official personally, for the real party in interest is the entity.").  As noted in our second Rule 12 opinion, the current Commissioner is the "appropriate defendant under *Ex parte* Young—as the agency head, [he] is charged with enforcement of the allegedly unconstitutional policy" that Melissa Lee seeks to enjoin.  <u>Rothermel v. Dauphin County</u>, No. 1:16-CV-1669, 2018 WL 4680093, at *9 (M.D. Pa. Sept. 28, 2018) (citing <u>Constitution Party of Pa. v. Cortes</u>, 824 F.3d 386, 396 (3d Cir. 2016)).  And by operation of Rule 25(d), Commissioner Evanchick is properly substituted for former Commissioner Blocker on this official-capacity claim.  <u>See</u> Fed. R. Civ. P. 25(d).

We conclude that the Commissioner is entitled to summary judgment on a more fundamental ground: Melissa Lee has not demonstrated constitutional harm.  Constitutional injury is a prerequisite for a governmental liability claim; that is,

absent an underlying deprivation of a plaintiff's constitutional rights, governmental liability will not lie. Mulholland v. Gov't Cty. of Berks, 706 F.3d 227, 238 n.15 (3d Cir. 2013) (citations omitted); Startzell v. City of Philadelphia, 533 F.3d 183, 204 (3d Cir. 2008) (quoting Brown v. Commonwealth of Pa., Dep't of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 482 (3d Cir. 2003)); see, e.g., Burns v. Femiani, 786 F. App'x 375, 380 (3d Cir. 2019) (nonprecedential) (dismissing claim against PSP when no underlying constitutional violation was shown). While it is possible for the government to be held liable even when none of its employees are, "there still must be a violation of the plaintiff's constitutional rights." Brown, 318 F.3d at 482 (citing Collins v. City of Harker Heights, 503 U.S. 115, 122 (1992)). We held *supra* that, because the bench warrant supplied probable cause and the arresting Troopers reasonably relied on that warrant, Melissa Lee has failed to establish a Fourth Amendment violation. Absent an underlying constitutional violation, the PSP Commissioner is entitled to summary judgment on this claim.[9]

---

[9] Because we conclude that the Commissioner is entitled to summary judgment on this threshold ground, we express no opinion on the propriety of what Melissa Lee believes to be the PSP's deficient policies. We must note, however, that the evidence offered by Melissa Lee to establish the parameters of those policies is sparse. Melissa Lee relies almost exclusively on the testimony of Trooper Grbich and Trooper Miller as to their belief that, when confronted with a confirmed NCIC hit for an outstanding warrant, they lacked discretion to investigate before arresting an individual who seemingly matches that hit. (Doc. 119 at 11-13). She also relies on the testimony of PSP Sergeant Douglas Howell, a staff services commander for Troop H in Harrisburg, who described how patrol officers will attempt to verify identity when an NCIC hit is returned but said he *does not know* whether the PSP has policies or training specific to that subject. (Id. at 14). Although we need not reach the issue, we doubt whether this evidence is sufficient for a jury to make findings as to existing PSP policy, custom, or training and whether that policy, custom, or training reflects deliberate indifference to constitutional rights.

## C. Dauphin County and Dauphin County Clerk of Court

Melissa Lee invokes several theories of liability against the Dauphin County defendants. In Count III, she asserts that Dauphin County and its Clerk of Court maintain customs and practices of exhibiting deliberate indifference to constitutional rights. Specifically, she contends that Dauphin County's five-step administrative procedure for producing and managing bench warrants is deficient because it "does not include an established procedure for a human user to guard against error." (Doc. 48 ¶ 137). In Count V, Melissa Lee avers that Dauphin County failed to adequately train and equip staff at Dauphin County Prison to prevent detention of misidentified individuals. (Id. ¶¶ 159-162).

Municipalities and other local governments are "persons" for Section 1983 purposes, see Monell, 436 U.S. at 690, but such entities are not responsible for every constitutional tort inflicted by their employees, Connick v. Thompson, 563 U.S. 51, 60 (2011). To bring a Section 1983 claim against a municipality, the plaintiff "must show that they were deprived of 'rights, privileges, or immunities secured by the Constitution and laws,' and that the deprivation of those rights was the result of an official government policy or custom." Mulholland, 706 F.3d at 238. The Third Circuit has explained that, to prove liability, the plaintiff must establish that the municipal policy or custom was itself unconstitutional or was the "moving force" behind the constitutional deprivation. Thomas, 749 F.3d at 222 (citation omitted). Where the challenged policy or custom is not facially unconstitutional, a plaintiff can establish causation "only by demonstrating that the municipal action was taken

with deliberate indifference as to its known or obvious consequences"—that is, "[a] showing of simple or even heightened negligence will not suffice." Berg, 219 F.3d at 276 (quoting Brown, 520 U.S. at 407).

A plaintiff may bring a policy-based Monell claim for an alleged failure to train employees. Thomas, 749 F.3d at 222. A failure-to-train claim requires the plaintiff to show that the alleged training deficiency amounts to "deliberate indifference" to the constitutional rights of individuals who will encounter those employees. See id. (quoting Carter v. City of Philadelphia, 181 F.3d 339, 357 (3d Cir. 1999)). This standard is demanding—it requires evidence that the municipality "disregarded a known or obvious consequence" of its deficient training program. Connick, 563 U.S. at 61 (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 410 (1997)). The alleged training deficiency must be closely related to the constitutional injury suffered by the plaintiff. Id.

Ordinarily, a pattern of prior constitutional violations will give notice to a municipal actor that existing training or policies are constitutionally problematic, and continued adherence to the original practices will demonstrate the "conscious disregard" required to establish deliberate indifference. See Thomas, 749 F.3d at 223 (citation omitted); see also Berg, 219 F.3d at 276. In rare situations, however, the need to act may be "so obvious" that failing to do so could rise to the level of deliberate indifference even without a pattern of prior violations. Thomas, 749 F.3d at 223 (quoting City of Canton v. Harris, 489 U.S. 378, 390 n.10 (1989)); see also Berg, 219 F.3d at 276 (same). Such "single-incident" liability turns on "[t]he likelihood

that the situation will recur and the predictability that an officer lacking specific tools to handle the situation will violate citizens' rights." Thomas, 749 F.3d at 223-24 (alteration in original) (quoting Brown, 520 U.S. at 409). That is, the plaintiff must show that the risk of the claimed constitutional injury was a "highly predictable consequence" of the challenged policy. Id. at 225 (quoting Connick, 563 U.S. at 63-64).

Melissa Lee has neither alleged nor proven a pattern of prior constitutional violations attributable to the Dauphin County defendants. She instead proceeds on a single-incident theory, asserting that the risks of criminal court records including embedded errors or of a detainee being misidentified are "so obvious" that failing to provide adequate safeguards reflects deliberate indifference to her constitutional rights. (See Doc. 129 at 21-22).

We allowed each of these claims to proceed at the Rule 12 stage. As to the claim concerning the warrant-generation process, we looked to Berg, where the Third Circuit held that the county clerk's failure to install any procedures to guard against the clerk's error in that case (transposition of two digits in a defendant's criminal case number) *may* rise to the level of deliberate indifference. Rothermel, 2018 WL 4680093, at *12-13 (citing Berg, 219 F.3d at 275-77). We acknowledged that Berg was factually distinguishable—there, the error was made internally by the defendant clerk's staff, while here, Melissa Lee contests the county sheriff's and clerk's failure to ferret out mistakes made by others—but allowed Melissa Lee to proceed on the theory that it was "plausible" that the risk of latent errors in court

records was so obvious as to require the clerk's office to install its own screening procedures.  See id.

As to Dauphin County Prison, we acknowledged precedent holding that, when a facially valid warrant exists, a detaining official has no constitutional obligation to investigate a detainee's claims of innocence.  See id. at *13; see also Baker, 443 U.S. at 145-46.  But we found Melissa Lee's claim to be distinguishable: she insisted that she was not alleging that prison officials should have investigated her claim of misidentification, but that the prison employed a dearth of identity-verification procedures and consciously delayed collection of important identifying information, such that they were, in essence, accepting all detainees blindly without verifying probable cause to detain.  See id. at *13-14.  We take up the parties' summary judgment arguments as to each of these claims *seriatim*.

### 1.    *Warrant-Generation Procedures*

As to the claimed deficiencies in the warrant-generation process, Melissa Lee's proof fails to substantiate her allegations.  Melissa Lee again relies entirely on Berg.  But as we previously noted, that case does not supply the whole answer.  See Rothermel, 2018 WL 4680093, at *13.  Berg involved a failure by the county clerk's office to establish any procedures to guard against *internal* errors in the process of preparing bench warrants.  Id. (citing Berg, 219 F.3d at 275-77).  The court held that, given the obviousness of the risk of wrongful arrest and detention when "the slip of a finger" could result in an erroneous warrant being issued, the county *may* have been deliberately indifferent to the plaintiff's Fourth Amendment

rights.  See Berg, 219 F.3d at 276-77.  Melissa Lee's theory goes beyond Berg: she suggests that the risk that there may be hidden errors—resulting from the slip of someone else's finger—in records received from outside entities is "so obvious" that the clerk's office and sheriff's office were constitutionally required to implement procedures designed to identify and correct such errors.  (See Doc. 129 at 122-28).

Melissa Lee focuses much of her argument on what the sheriff's office and clerk's office could have done differently.  (Id.)  But her argument ignores the threshold question—whether the risk of hidden errors made by others was "so obvious" that the Dauphin County defendants could be found to have been deliberately indifferent in failing to anticipate and guard against it.  See Thomas, 749 F.3d at 223 (quoting City of Canton, 489 U.S. at 390 n.10).  Melissa Lee has adduced no proof from which we could answer this inquiry in the affirmative and no case law suggesting that Dauphin County's obligations reach that far.  Our independent research reveals no constitutional principle mandating the level of scrutiny suggested by Melissa Lee.

On this record, no reasonable jury could conclude that the Dauphin County defendants were aware of and deliberately indifferent to a "highly predictable" risk of false arrest in failing to establish more discerning warrant-generation protocols. See Thomas, 749 F.3d at 225.  To hold these defendants constitutionally liable for failing to discover a latent error for which another entity is to blame—particularly absent any history of similar errors—would impermissibly overextend Monell and

its progeny.  Accordingly, the Dauphin County defendants are entitled to summary judgment on this <u>Monell</u> claim.

### 2.    *Detainee-Identification Procedures*

We turn lastly to Melissa Lee's <u>Monell</u> claim concerning allegedly deficient intake protocols for bench warrant detainees at Dauphin County Prison.  Melissa Lee claims that Dauphin County maintains several policies which contributed to the violation of her constitutional rights, specifically: failing to collect fingerprints or other data to verify the identity of bench warrant detainees, failing to ensure that descriptive information on a bench warrant matches the individual detained, and unnecessarily delaying the intake process by collecting identifying information over several days.  (Doc. 129 at 19).  On this point, we agree with the defendants and Judge Carlson that no reasonable jury could find that Dauphin County Prison violated Melissa Lee's constitutional rights.

It is well settled that the "first inquiry in any § 1983 suit . . . is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" <u>Baker</u>, 443 U.S. at 140.  In addressing this question in this case, Dauphin County focuses on the Supreme Court's decision in <u>Baker</u>.  We agree that the decision is instructive here.  In <u>Baker</u>, plaintiff Linnie McCollan was arrested on a warrant intended for his brother, Leonard McCollan.  <u>Id.</u> at 141.  The error occurred because, when Leonard was initially arrested on drug charges, he provided officers a forged driver's license bearing his own photograph but his brother's identifying information.  <u>Id.</u> at 140-41.  Leonard's bondsman requested an arrest warrant, and,

due to Leonard's fraud, the warrant that issued listed Linnie's name and identifying information.  Id. at 141.  A few months later, officers conducted a routine traffic stop of Linnie's vehicle and discovered the outstanding warrant.  Id.  Because the name and information on Linnie's driver's license matched the warrant, Linnie was taken into custody despite his claims of innocence.  Id.  He was detained for three days, over the New Year's Day holiday, until officials reviewed the file photograph of Leonard, determined they had the wrong man, and released Linnie.  Id.

Linnie sued the sheriff under Section 1983 on a supervisory liability theory, claiming the sheriff failed to institute identity-verification procedures that might have disclosed the misidentification sooner.  The Supreme Court was careful in framing the claim, noting that Linnie did not challenge the warrant or the arrest itself, but instead the failure by the sheriff's office to investigate and discover the misidentification.  Id. at 143.  The Court then rejected Linnie's claim, reasoning:

> Absent an attack on the validity of the warrant under
> which he was arrested, respondent's complaint is simply
> that despite his protests of mistaken identity, he was
> detained in the Potter County jail from December 30,
> when Potter County deputies retrieved him from Dallas,
> until January 2, when the validity of his protests was
> ascertained.  Whatever claims this situation might give rise
> to under state tort law, we think it gives rise to no claim
> under the United States Constitution.  Respondent was
> indeed deprived of his liberty for a period of days, but it
> was pursuant to a warrant conforming, for purposes of our
> decision, to the requirements of the Fourth Amendment.
> Obviously, one in respondent's position could not be
> detained indefinitely in the face of repeated protests of
> innocence even though the warrant under which he was
> arrested and detained met the standards of the Fourth
> Amendment. . . .  We may even assume, *arguendo*, that,
> depending on what procedures the State affords

> defendants following arrest and prior to actual trial, mere
> detention pursuant to a valid warrant but in the face of
> repeated protests of innocence will after the lapse of a
> certain amount of time deprive the accused of "liberty . . .
> without due process of law." But we are quite certain that
> a detention of three days over a New Year's weekend does
> not and could not amount to such a deprivation.

Id. at 143-45. In other words, because there was no Fourth Amendment challenge as to probable cause, and thus no challenge to the sheriff's authority to detain, the Court tested the constitutionality of Linnie's continued detention against due process standards alone. See id. The Court resolved that, being presented with a facially valid warrant, the sheriff was not required "to perform an error-free investigation" of Linnie's claims of innocence. Id. at 145-46.

At first blush, Melissa Lee's challenge to the constitutionality of her underlying arrest seems to render Baker distinguishable. But with the court having concluded that the record does not support a false arrest claim, see *supra* at 14-18, the cases now align. Because "the probable cause standard for pretrial detention is the same as that for arrest," Baker, 443 U.S. at 143, the facially valid bench warrant that supplied Trooper Grbich and Trooper Miller with probable cause to arrest Melissa Lee also supplied Dauphin County Prison with probable cause to detain her. As a result, Melissa Lee cannot establish a deprivation of her Fourth Amendment rights to support her Monell claim against Dauphin County.

Melissa Lee's path to liability against Dauphin County is thus winnowed to the narrow due process claim contemplated by Baker, and it necessarily meets the same fate. Prison staff arguably could have done better in responding to Melissa

Lee's claims of misidentification, particularly given the discrepancies she noted in her intake paperwork. But <u>Baker</u> is clear that the Constitution does not mandate an "error-free" investigation of a detainee's claims of innocence. <u>Id.</u> at 145-46. And while a due process deprivation may arise at some point in a mistaken detention, a three-day detention "does not and could not amount to such a deprivation." <u>Id.</u> at 145. Accordingly, Melissa Lee has failed to identify an underlying constitutional injury attributable to Dauphin County, and the Dauphin County defendants are entitled to judgment as a matter of law on this final <u>Monell</u> claim.

## IV. <u>Conclusion</u>

We are not unsympathetic to the unfortunate circumstances that befell Melissa Lee in February 2015, and we do not doubt her testimony that her mistaken arrest and detention, and the repercussions of those events, have wreaked havoc in her personal and professional life. But our decision in this case cannot be guided by sympathies. At this stage, no material facts remain in dispute, and the question is whether any defendant caused harm of a constitutional dimension to Melissa Lee. As we have explained, the Rule 56 record combines with precedent to answer that question in the negative. We will thus grant summary judgment to all defendants as to each of Melissa Lee's remaining claims. An appropriate order shall issue.

 /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated: March 26, 2020